Case number 18-1098 Marshall County Coal Company v. Federal Mine Safety and Health Review Commission Ms. Scott is the respondent and Ms. Clark is the plaintiff. May it please the court. My name is Margaret Lopez and I represent the petitioners Marshall County Coal at Allen. On this case with me is Mr. Michael Glass. I'd like to reserve five minutes of my time for rebuttal. Your Honors, an underground coal mine is a very dynamic, constantly changing environment and this can have adverse consequences for safety. This case concerns a mine operator's ability to communicate with its miners about the importance of reporting hazardous conditions to mine management quickly so that they may be timely addressed before anyone is injured. Among the issues in the case are the test for interference under Section 105C3 in the Federal Mine Safety and Health Act. This has to do with interference with protected rights. Another issue concerns whether there was substantial evidence to support the judges and the Commission's finding of interference in this case. And finally, another issue concerns whether the Commission can order the CEO of petitioner's companies, Mr. Robert Murray, to read a statement drafted by the court to the workforce that essentially was admitting liability of wrongdoing under the Mine Act and interfering with miners' rights. Your Honors, this case really focuses on presentations that were made to the workforce at each of the five mines in this case. These presentations were made by Mr. Murray, who's the new owner of the mines, in a very competitive market. The presentations focused on many aspects of the operation, particularly those concerning production, efficiency, and the other competitive pressures that the mines were facing. There was a very small portion of the presentations that concerned safety. Essentially, there were three or four slides that really focused on safety. This was a very small part of a very large presentation. And the purpose of the presentation was not to fool miners into calling MSHA, but rather to remind miners of their important role under the Mine Act in keeping management informed of safety issues so that these issues could be quickly addressed. Having a safe mine... What prompted the need for that reminder to the miners? The company was concerned that issues were not being reported. MSHA was coming out on... According to the slides, what does it reference as prompting the request that submissions be made to them? The three slides in the presentation that the court is focused upon have to do with Section 103G of the Mine Act, which is a hazard reporting requirement under the Mine Act, or at least a hazard reporting right for miners. It gives miners and miners' representatives the right to report to the administration, the Mine Safety and Health Administration. The slides specifically reference filings under 103G... Yes, they do, Your Honor. ...of the act to the administration. Yes, they do, Your Honor. You argue a lot about requiring motive. And I just want to be clear on what exactly it is you mean by motive in this case. Thank you, Your Honor. Do you mean a motive or the motive? Let's start with that question. Your Honor, if I understand your question, we mean that the motive for the operator's action has to be based upon concern with protected activity, basically wanting to limit or interfere with protected activity on the part of miners. So that's our understanding. So does it have to be the motive or a motive? It can be a motive under the prima facie part of the case. That's your client's position? Because your client has argued different positions throughout this case and has taken a much narrower position in the case that's still pending before this court. I'm not going to say it right, Monongalia case? Monongalia case, yes. Monongalia, Your Honor. No, actually... What's your client's position first on a motive versus the motive? What is your client's position on that? Our client's position is as an affirmative defense, the operator can show but for causation, which is that the operator was not motivated by protected activity in any way. So you're rejecting the in any part aspect? I'm sorry? You're rejecting the in any part aspect of the causation test that's used for discrimination? There's actually a... I'm sorry, Your Honor. It's actually a multi-part test. The miner or the Secretary of Labor can prove in the first instance on their prima facie case part of the test that motive was a part of what caused the operator to act. This is under the discrimination test that we believe should be applied here. But then the burden shifts to the operator, where the operator can show that the operator was not motivated in any part by protected activity or that the operator would have acted based on unprotected activity alone. So it's a burden-shifting type of analysis. So you've told me that the language here is plain in the statute. Yes, Your Honor. The plain language Chevron Step 1. So the plain language Chevron Step 1 of this statutory provision, does it require that... would it allow liability if your client had been motivated in any part by the exercise of rights under 103G? Your Honor, our... The client's position on that. Our position on that is that because of that, because language in Section 105C, the Secretary first has to show that their motive was a part of what caused the operator to act. But the statute surely doesn't set out a burden-shifting framework, right? That's what the agency has adopted. But the statutory language because of, you're saying means, what type of causal or motivational tests are you asking for? Your Honor, we are asking the court to apply what basically has been the longstanding case law under Section 105C for proving discrimination, applying that essentially to interference cases, which calls for the Secretary of Labor to show that motivation was at least a part of what caused the operator to act. But then the operator as a defense can show that the operator was either not motivated by protected activity at all or would have acted based on unprotected activity. At all. So if there's in any part, you agree that the statutory language would allow liability if your motive was in any part in response to the exercise of statutory rights? No, Your Honor. We also believe that there is an affirmative defense opportunity for the operator, which again exists under the Pestoola-Robinet test. It's long been in place. It allows the operator to show that even if there was some motivation based on protected activity, the operator would have taken the action that he did based on unprotected activity alone. So there is this but-for causation part. Do you think it means but-for causation? Pardon me? Do you think the plain language is but-for causation? Yes, Your Honor. The plain language proposes a substantial factor. Ultimately, that's correct. If you look at all the elements of the test and the affirmative defenses that are available, we support but-for causation. And then is the motive motivated by the actions of filing complaints or motivated by an intent to interfere with rights? What is the plain language answer to that? Your Honor, if you're speaking to whether we believe that the Act focuses on past protected activity? No. I'm asking exactly what I asked, and that is, must the motive be, whether retrospective or prospective, must the motive be motivated by the filing, the actions of minors or must it be motivated by an intent to interfere with their ability to file complaints? If I understand the question, we believe that the motive has to be focused on wanting to interfere with their filing complaints. So because language focuses on filing of complaints with MSHA, the operator needs to be acting to try to interfere, to deter or chill that type of activity. The actor would have to know, this is your plain language interpretation, would have to not only be reacting to conduct by minors, but would have to intend to interfere with known legal rights. Correct. So, Your Honor, we do believe that the Mine Act is susceptible to a plain language or should be interpreted under a plain language type of analysis because of the language and structure of Section 105C, where interference was put directly into the statute itself. And I think it's worthwhile to point out that under the Secretary's argument, they focused on the National Labor Relations Act as helping us to interpret the Section 105C. And we believe that Section 8A1 of the National Labor Relations Act, taken in concert with Section 8A4, shows that if Congress wanted there to be a different test for interference and for discrimination, Congress would have divided these out into separate sentences. But that's not what occurred in this case. Congress put interference directly into that same sentence as discrimination and actually put it right before the because of language in Section 105C. Do you agree that the slides, even taking your approach that we look only at the slides addressing 103G, do you agree that Marie's position there was motivated by the fact that a lot of claims were being filed? Your Honor, Mr. Marie's motivation was not with stopping filing valid claims. I'm asking you, do you agree that what motivated that part of the presentation was the fact that minors had been filing a lot of complaints that were, in Marie's view, deemed to be unwarranted? We do not agree with that, Your Honor. What does it mean? What do those slides mean? The focus was on the use of 103G for completely unrelated safety purposes. These were invalid complaints. Right, and so that's what motivated his presentation was what he said were invalid complaints. Invalid complaints that had no merit. So there was no safety merit to that? Correct. Okay. But you agree that the filing of complaints that, in his view, had no safety merit is what motivated that aspect of the presentation? Invalid complaints, Your Honor. Invalid complaints. So just to be clear, we'll give you some time. But just to be clear, so your position is that the reason it didn't trigger this plain language was that he was not intending to interfere with what he understood to be their legal right. He thought they were exercising something that wasn't legally protected. The PowerPoint presentations make it very clear, as do the transcript, that Mr. Marie said multiple times, we are not going to interfere with your 103G rights. You have the right to call MCHIP. We just want you to let us know when there's a safety issue. That's something that's very important. I'm just talking about what prompted this, and I just want to make sure I'm clear on your understanding. And it's that there's no question here that the filing of complaints was something that was being reacted to here. It's just that Murray's or Marshall Cole's view was that those were not legally protected complaints because they didn't, in his view, address safety. But clearly, the filing of those complaints triggered this part, at least this part of the presentation. The concern, again, Your Honor, was that the complaints were not valid. And therefore— I'm not asking about the concern. I'm asking about what triggered. It was the filing of invalid complaints. Invalid complaints. Complaints that were not going to further the cause of safety and actually were detrimental to safety because they were calling safety people off of doing their safety-related duties to walk around with the mine inspector to look at something that didn't exist. They were being used for the union's purposes. I see I'm into my rebuttal time, so— We'll give you some extra time. All right. Thank you. Because I've been interrupting you a lot, so if there's more points or if my colleagues have questions. Now, in terms of the reading requirement, the Secretary argues that that's been—that hasn't been preserved. That is the Secretary's argument? Yeah. Yes. And your position— Right. Our position— And then the reference to, oh, that's over the top, that that was enough to preserve it? As well as the other references that we mentioned in our brief. There actually were at least five times when at one point or another in the briefing or in that hearing with the ALJ, we mentioned or actually raised an objection to the personal reading requirement. And I'd actually like to also note— There was a single place where someone on your behalf or your client said, we object to that as a legal matter, and we were preserving that objection. What was that? Your Honor, the objection— Well, it's over the top. Okay. That's not an objection, alas. Well, Your Honor, in the first opening brief to the Commission, which is in Appendix 226, as well as in the first petition for discretionary review that we filed with the Commission, it was in Appendix 193 to 94, we noted that there was no indication in the judge's order as to who will prepare or approve the statement to be read, and that order potentially could infringe on First Amendment rights. Who has the objection to the order? All that says is we don't know who's going to prepare it, not that we object to anyone preparing it because we shouldn't have to read it. Your Honor, that actually goes to a key point that we would like to make with respect to this forfeiture argument, which is that the nature of the remedy changed considerably throughout the course of this case, and ultimately it became a statement that was drafted completely by the administrative law judge, a statement that was different than the one that the companies had proposed. And I'd also like to point out— But then the first— No, no, no, no, no. You're missing what Judge Peralta asked you, which is when did you object? And I'm asking you the same thing. You go into law school. You understand the game. Where is it in the record that you objected? We object, as a legal matter, to any requirement that we have to read a notice. Your Honor— Equivalent to who was going to write it, whether it was over the top and all that. Where's the objection, as we lawyers understand it? Absolutely, Your Honor. In briefing on remand to the administrative law judge, which is at the appendix 350 to 51, we reiterated that using the notice language was what we felt was the proper step to take if a reading was going to be required at all. And we stated that compelling a reading implicates First Amendment protections. So this was raised. And the ALJ, in her first decision— And her footnote on your very last, your penultimate sentence in that brief, when she says it implicates, is that the same as raising? That was the intent behind that word, Your Honor. Well, counsel, come on. Potentially? You know better than that. That's not an objection. Well, that was our intent with that word. I mean, this is an easy objection to make if you really have the objection. And if you go back and look, I know you have your job to do, but you can't take that seriously. There's no objection here. You're supposed to raise it with the ALJ in the first instance. And, Your Honor, I would like to point out that in the first decision written by the ALJ in November 2015, she actually analyzed, under the National Labor Relations Act, the personal reading case law. So she understood that this was going to be an issue. And she did analyze whether she was— Well, no, no. She was writing an opinion which covered the basis, and that was among the things that she covered. And she was analyzing the same case law that we have cited to show that the personal reading requirement is not appropriate. I don't think I'm getting the nature of your objection. So as I read this footnote, which is on remand, right? It's not the initial proceedings. Correct. But even then, if the Secretary seeks to include further material, it could potentially constitute compelled speech. So in your view, it's not the fact of the reading requirement. It's what it includes. Is that right? That was the nature of our concern. The reading requirement changed to one that was drafted by the government rather than by us. So what is the content that your client objects to? The statement differs significantly from the notice that was posted at the mine. And in part, it notes that the Murray Energy Corporation and its West Virginia subsidiaries have violated the Federal Mine Safety and Health Act and has ordered me to read and abide by this notice. That's the very first sentence in the statement. So it's the fact of violation that having to say that Murray violated? That's the First Amendment problem? That is one of the issues. And the case law under the National Labor Relations Act shows that that is really a shaming type of action to order an individual to do, to stand up in front of basically, in this case, his employees and say, I violated the law. So Murray contemplated that when the parties, the secretary would agree to reading a statement that did not include an acknowledgment that the company had violated the law? The statement that we put forward, Your Honor, is the one that was posted, which reiterates the miners' rights under the Mine Act to file complaints with the Mine Safety and Health Administration and does not discuss in one way or another the company's view or admission, basically, of any kind of violation of the law. But even in the very beginning, there was no contemplation that it would be unilaterally drafted by Murray, right? It would have to be approved by the secretary. That's correct, Your Honor. It was going to be mutually drafted by both parties. That was our understanding. And that's the way the notice was drafted. But that's not what ended up happening with the person reading the statement. And that didn't give enough note. Your position is that the contemplation at the end, before the ALJ initially, that a senior officer would have to read a statement that the secretary agreed to that had yet to be drafted, that wasn't enough to put Murray on notice that if there was going to be a First Amendment objection, it needed to be clearly raised. That's your position. I believe so, Your Honor, if I understand what you're saying. Our understanding of what the remedy was going to be was quite different than what, I mean, very different than the way it ended up evolving over the course of the case. And as soon as we realized that this was actually going to be an ALJ-drafted statement and saw what the statement was, we fully briefed those issues to the commission. That was after the remand. And was there some place, once again, where you said you fully briefed those issues? Where did you fully brief those issues? That was in our briefing to the commission after the remand. It resulted in the last decision from the commission that's at issue in this case, the second decision. And when you say the issue, that there's a First Amendment problem? There could be. It's that footnote 6 that you're pointing to? Where's the full briefing of the, it violates the First Amendment for him to read the statement? It does violate the First Amendment? You're talking about the supplemental brief regarding issues remanded in the ALJ? It was after the remand in the ALJ. I'm sorry, Your Honor. I don't have that citation in front of me. I'm looking at J343, that brief. Is that the one you're talking about? That's correct, Your Honor. It begins on page 349, the argument. Okay, so that's about whether the aim of, that's back to the adding additional language would be punitive and not remedial. You cite any First Amendment cases here? No, Your Honor, it's just mentioned in a footnote. Your Honor, we maintain under the National Labor Relations Act case law in this Court's decision in HTH, this is not an appropriate remedy, regardless of whether it's a First Amendment violation or not. We have an alternative argument that we've been advancing in this case, and that actually, that National Labor Relations Act argument is actually the one that the administrative law judge had analyzed in her first decision. We'll give you some time. Thank you. May it please the Court, Emily Toler-Scott for the Secretary. The Secretary agrees that miners' participation in safety matters is essential to the enforcement of the Mine Act. The Mine Act places the responsibility for preventing safety and health hazards on mine operators with the assistance of miners. And in the legislative history, Congress explained that if our national mine safety and health program is to be truly effective, miners will have to play an active part in the enforcement of the Act. Miners should be able to report safety and health hazards to mine operators. But some operators may take no action to correct hazards that are reported. Some operators retaliate against miners for making reports, and some operators discourage miners from making reports. So Congress created a mechanism for miners to make those reports to MSHA when they don't feel that they can make them to the operators. And that's the combination of Section 103G, which gives miners the right not just to make complaints, but to make complaints that are required to remain anonymous. And by Section 105C, which protects miners both from discrimination for making complaints and from interference with making complaints. Murray's position here would hollow out both of those provisions, while the Secretary's would ensure their vitality. I'd like to begin then with... The complaints have to be right, they have to be valid. At the end of the day, does a miner have to be right that there was an actual safety violation in order to be protected? No. Section 103G gives miners the rights to make those complaints when, I apologize, I don't have the exact language, but reasonably believe or have grounds to believe. So there is some element of miners protected regardless of whether they're right. And in the Muncie case, this court held under the Cole Act that even complaints that are frivolous or not made in good faith would still be protected. And it's important to note here that simply because MSHA... Have we made that holding yet under this statute? Not that I'm aware of, Your Honor, but Commission ALJs, I believe the union's brief cites a few of those cases, have applied the Muncie holding to 103G. It doesn't matter... Is there any differential in the language between the two provisions that would say even frivolous ones were protected under the Cole Act, but here they're not? I don't think there is any basis for that interpretation. The Mine Act expanded the protections that existed under the Cole Act. I would have to look at the precise language to give you a better answer to that. I don't have the Cole Act language in front of me, but I'm not aware of any case where the Mine Act has restricted the scope of rights that were guaranteed by the Cole Act because the whole point of the Mine Act was, of course, to make mines safer and to expand miners' rights. I understand, Ms. Scott, that this is not the facts in this case, but could an operator have a policy that required all employees to report any safety concerns to the operator without linking it to whether they're making a complaint to MSHA? This may be kind of an unsatisfying answer, I'm going to say. It depends on the totality of the circumstances. It is not the Secretary's position, though, that reporting policies like that are across the board unlawful. That is absolutely not the Secretary's position. Instead, what matters is, again, the totality of the circumstances. If a policy like that provided some way to preserve anonymity, to guarantee miners' anonymity, I think that would help to make that policy lawful. If there were no evidence of hostility or animus, again, that would be a factor that would tend to make a policy more lawful. And if it were limited in scope in some way or demonstrated some tailoring to accommodate miners' rights. And again, this is exactly what the Secretary's test for interference contemplates. First, the Secretary establishes reasonable tendency to interfere, but the second step of the Secretary's test is a really important one, because it does accommodate for a mine operator's legitimate and important, legitimate and substantial, I guess I should say, need to be informed about hazards at mines. So some policies would absolutely be lawful. This policy was not, not even close. You argue about Chevron deference for the Secretary's litigating position, interpreting the language because of language.  I mean, can the Secretary just in the next case adopt a different position? Or when you claim Chevron deference, does that mean you've, the Secretary has agreed to find herself or himself absent, a sort of grand reasoned explanation for the change of position? I think that is the Secretary's position. As our brief explains, this is the position the Secretary has consistently taken since the Franks case, before the commission in every interference case, not just before the commission, but I guess only this one before the courts of appeals. I will also just note that with respect to the litigating position issue, the Secretary is in kind of a strange bind when it comes to embodying interpretations in one of five C cases. So normally the Secretary issues a citation to say here's what this regulation means or here's how we interpret the Mine Act. But the Secretary can't do that under Section 105C. The mechanism the Secretary has for articulating his interpretation under 105C is filing a complaint with that interpretation, which is precisely what the Secretary has done in this case. And I will also note, as our brief explains, the court has repeatedly explained that the Secretary's litigating position, in any event, is an exercise of the Secretary's discretion. I think, Judge Millett, your exchange with Ms. Lopez illustrates that Section 105C does not have a plain meaning. It's long. It does say because, but because doesn't necessarily require motive, particularly in the context of the text of the statute, but more importantly in the context of the remedial purpose of the Mine Act. I'm not aware of, and Murray has not cited, any case where the court has adopted a strict, literal, hyper-technical reading of Section 105C or of its predecessor under the COLA Act, Section 110 of the COLA Act. Instead, every case that I'm aware of, this court has rejected an interpretation like that and has instead looked to consequences, to congressional intent, and to the remedial purpose of the Mine Act. And the Secretary's interpretation is the one that can be squared with each of those things, whereas Murray's cannot. The legislative history, I think, makes this very clear. Is this provision just an anti-retaliation provision? Section 105C? No, it's not just an anti-retaliation provision. I think the prohibition on discrimination goes to anti-retaliation, but interference is separate and it's different. So interference is not aimed just at retaliatory action. Interference is aimed at threats that have the effect of interfering. Congress said in the legislative history that Section 105C must be interpreted expansively so that minors will not be inhibited in any way from exercising their rights. Congress didn't just say minors won't be punished, minors won't be retaliated against. Congress made a distinction here that interference, or that Section 105C, has to encompass both of these things, not just punishment. So this case, as some of the commissioners thought, there's evidence here of a motive. So give us the kind of case that you're thinking is at stake in the distinction between your position, interference, and the operator's position that there has to be some motive. What would fall by the wayside were they to prevail? Some examples are in our brief, but another one is Monongalia, for example. So a case where an operator, perhaps even acting in good faith, and I don't mean to mischaracterize the facts of Monongalia, it involves bonus plans, incentive plans essentially that were created at the mine. So I am not talking about these plans or the plans in that case. But some bonus plans could create so much disincentive for minors not to report hazards that it would create interference with their rights, even if a mine operator was acting in good faith. And so that's an important concern. I think other concerns would be... So you're really asking the commission and the courts to get involved in weighing the degree of safety interference or reporting interference and the managerial prerogatives. I mean, that's sort of what the two prongs of the Franks test contemplate. Yes, I think that's right. And I don't think that's all that different from the kind of balancing that the commission and the courts engage in in a variety of anti-discrimination burden-shifting approaches. What about under the NLRA? There's not really a two-prong test for the interference under the NLRA. No, that's true. But I think that, or my understanding of the NLRA is, or the interpretation of the NLRA is just reasonable tendency to interfere. End of story. I think the Secretary's test is more reasonable than that because it does have the second element, which accommodates an operator's legitimate business needs and doesn't give the Secretary carte blanche, as Murray has suggested, to go around filing complaints every time an operator took some action that arguably might deter a minor from filing complaints. Again, the Secretary still is going to have a significant burden to meet in these cases to prove interference, a reasonable tendency to interfere in the first instance. The Secretary's not always going to be able to establish that in all likelihood. And then second, the operator will also have the opportunity to rebut that, to provide a legitimate and substantial reason whose importance outweighs the harm to protected rights. It's not inconsistent with the NLRA. No, I don't. The NLRB in measuring interference cases would take into account the business interests asserted by the employer. Right. Oh, okay. So, yes, I mean, I don't. That so-called second test is all encompassed in NLRA cases. Which I think then just illustrates again that the Secretary is not asking for anything novel or unusual or difficult. The Secretary's test is just consistent with how interference is analyzed in a variety of other standards. But the NLRA statutory provision there doesn't use the because of language. That's true. It doesn't. Doesn't that seem kind of an important difference? It is an important difference. But the Secretary's sole justification for the reasonableness of the test is not just the NLRA. It's one element of a reason that the Secretary's test is reasonable. But the NLRA's context is also different from the Mine Act context. And I think this is an important point. Mining is very, very, very dangerous. And MSHA is at mines a lot but cannot always be there. And so miners and mine operators are in the best position to identify hazards. And I don't think – and in enacting the Mine Act, Congress was very clear that miners have to be involved. They have to feel like they are entitled to make complaints. And if – and adopting a test that required motive would mean that, at least in some cases, miners who were the victims of conduct that had the effect of deterring them from exercising their rights would not be able to establish that that action was unlawful. And that's not what Congress meant. Why wouldn't that same language apply to the discrimination phrase? Why would Congress want discrimination to require motivation? Because it's discrimination against them for exercising their rights. So why, given what you've just said, would Congress have wanted – and this is under administration tests – a causal element for discrimination or discharge? Well, I think Congress said in enacting the Mine Act – I'm at the end of my time. Congress said in the legislative history when it added or otherwise interfered with to the Coal Act, Congress said this is meant to broaden the existing protections. So what was already prohibited by the Coal Act was retaliation – retaliatory, discriminatory action. But Congress said this is supposed to be broader. And it added interference and added the interference language particularly, dropped it in between the discrimination – the prohibited types of discrimination and the because language. But Congress said this is broader, this is different, and it must be construed expansively to ensure that miners are not inhibited in any way from exercising their rights. And I think – I'm sorry, finish your test. And I think that that language is indicative of Congress's attention to effect and not just to motive. Congress said what matters is miners being or ideally not being inhibited in any way from exercising their rights. And the Secretary's test is consistent with advancing that purpose. I'm still just circling back on – you said in your brief you talk about what's at stake in terms of the motive-based versus the interfering effects-based analysis. And one of the things that I didn't really follow in your brief was why you think there's this prospective-retrospective distinction. It seems to me one could discriminate prospectively just as one could interfere prospectively. So that – I don't find that very convincing. Maybe you could help me out. I don't think that as a rule, discrimination is retrospective and interference is prospective. I think generally that's probably how it shakes out. But, for example, if one could show that a bonus policy was adopted with the intent to discriminate between people who would exercise their reporting rights and those who wouldn't, and it was – nobody had done it yet, but it's just saying, you know, we're looking ahead and we want to make sure that doesn't happen. I mean, that could be – if motive were shown, discrimination among miners based on that characteristic. So it just – it doesn't work conceptually for me. And so I'm still trying to really understand what the core body of cases is that you think would not be actionable, that needs to be actionable under your reading, would not be actionable under the operator's reading, that would be actionable. I think maybe the better distinction than Judge Pillard would go to remedies. So in a discrimination case, miners are going to receive – I mean, there are particular remedies under the Mine Act such as temporary reinstatement provisions, but miners are also entitled generally in commission cases to back pay, to expunging of records, things like that that are traditional remedies in discrimination cases. But an interference remedy can be different. Like the remedy in this case, for example, not the statement reading requirement, which is a separate issue, but enjoining the operator from taking action like this in the future I think is important. Right. But if there were proof that the interference were intentional, that remedy would be available under the operator's perspective. So, again, I thought that the – saying, well, you know, promise of benefit or threat of reprisal is – covers some adverse action that may not be formally listed as discrimination, but it could be present – that kind of action and remedies for that kind of action would be available, presumably, in a case in which the interference would prove to be motivated. I think there's also an element in discrimination cases, though, that the secretary has to prove a miner has suffered an adverse action and a threat of – Right, but – so there's going to be – we're assuming that interference – there is an interference action. The question is, if the interference action required a motive, what kind of case that's important from the secretary's perspective would no longer be actionable? And you said, well, a case that would get this kind of remedy. And my response to that is, no, if intentional interference were shown, that remedy would still be available. Right? I think so. Okay. I guess – I suppose this may be an unsatisfying answer, too, but they are – these are fact-based things. I don't think the secretary can anticipate every clever means that a mine operator might identify to – or not even deliberately, but that might occur at a mine, whether deliberate or not. I can't – I've tried to give you a few hypotheticals. I wish I could give you more ones that you found more persuasive, but we don't see them a lot, but they're out there. And I think changing – I'll wrap up here, but just changing one fact in this case, for example, I think really – hopefully we'll make this point a little more coarsely for you. If none of the miners in this case had filed Section 103G complaints, and instead Mr. Murray had simply convened these awareness meetings and given precisely the same speeches, but without any evidence that this action had been precipitated by the complaints or without any evidence of animus, then according to Murray, that wouldn't be an interference violation. But I don't think that that's a reasonable outcome. It's certainly not one that Congress intended when it said that miners must not be inhibited in any way from exercising their rights. And I don't think that the court should accept an interpretation that would lead to that result. I mean, you're arguing intentional means the action will obviously have adverse effects. And the employer has reason to know that. And anyone looking at it can reasonably assume that the protected class will feel the same. It does not mean you've got to go into the head of the employer and be able to prove that that's what the employer sat down and thought before acting. I mean, this is a weird discussion for me because in the NLRB cases, that's certainly what we tend to do. Intentional means you know, you have every good reason to know it's going to have this effect, and those who are going to suffer from it are certainly going to be threatened or whatever. And you're held responsible. And we assume that you had the motive, so-called. But we're confusing intentional and motive here in a way that I don't think the law really supports. Yeah, motive can mean and intentional can mean someone sat down and designed a plan, a bad plan, and then implemented it. It also has been read to mean intentional. You implemented something that if you thought about it carefully, you had every reason to know it was going to have adverse effects on protected parties. And we hold that that's an intentional action. I'm missing something here. I think maybe there is a distinction between intent and motive, as you suggested, and that I agree that it's not totally clear to me how or what the supposed plain meaning of- Well, we're reading because very broadly or in a very strange way to assume that it includes both, especially given the legislative history. If we're reading motive the way I'm suggesting, that you've got to be able to prove by a certainty that someone actually thought to do what was being done, as opposed to someone had an intention to do something that clearly was going to have the adverse effects that it's having. Right. I don't think the Secretary has to prove, or under the Secretary's test, either of those would be required. No, I'm trying to understand what the difference is. I mean, following up on what Judge Kohler was asking, I'm not sure what the difference is between the two of you. You can ask the other side if the other side means to say, unless you can show the cause means motive, in the sense we're talking about, that seems to be a very strange interpretation. Well, I hope that Counsel Murray can help you with that issue, Judge Edwards, because I agree that it's not clear to me exactly how the operator would like motive to work in their test. I thought they were quite clear that they want a strict motive standard that requires a motive to interfere with known legal rights. Well, the brief is a little unclear to me about whether it's – That's why I asked the clarification. Okay. Well, if that's the position, then I suppose that we simply just disagree about this. And again, the Secretary's test is nothing novel. It is simply how this – or not just how, but consistent with how this Court has approached Section 105C cases and how generally interference cases in other areas of the law are approached. Can I just ask you, because their argument is, look, we want to promote safety, and we'd like to know as soon as possible about safety problems. Or that is at least a mining company could justifiably think, please tell us. If you see something, please tell us right away. Has the Secretary or the Administration approved, blessed certain policies that a company has adopted for encouraging reporting? Have you found something that encourages reporting by miners to the company in a way that is still deemed to be consistent with the statute and not violating 815C? I'm obviously outside the record to answer that question. I don't know if there's decisions or Secretary positions. It would be a public record once. I will just say that many, many mines have injury reporting policies or requirements. And the Secretary's – the reason that this policy – I'll say, I guess, actually, generally more the awareness meetings, which I mean have to encompass both the policy itself and the – I get the argument about this case. I'm sorry to interrupt, but I'm just trying to see is there – if someone wanted to do it right, is there an example or something they could go to to know how to do it? Or do they have to sort of try and – I don't think they would just have to try. I mean, I would hope that the Secretary would be willing to work with mine operators. But as I was describing to Jim Miller, there are characteristics of reporting policies that would tend – that would help mine – or that would make them much more likely to be lawful. Those are cases where there's no evidence of animus, cases that are – situations without animus, situations where miners' anonymity is protected, situations where there's, again, some evidence of accommodating miners' rights, like a recognition that this policy might implicate those, but some way to mitigate those effects. Well, one thing you might point to, I think you pointed to in your brief, is that PAC made clear that an operator has the right to require the reporting of dangerous conditions. And the Mine Act itself recognizes the importance of an arrangement. Yes. So the policy in PAC may very well be a lawful policy. I can't say that it necessarily is because there simply aren't facts. We don't know the totality of the circumstances analysis. But there wasn't in PAC evidence of animus or hostility. There weren't coercive and threatening meetings. The things that made the awareness meetings so egregious were not present in that case. And, again, I do want to emphasize it is absolutely not the Secretary's position that these – that any policy that requires reporting is unlawful. That's – it's not. And is your position that the Secretary will work with miners if approached on developing lawful policies? Operators. Sorry, operators. Yes, I think that the Secretary would be willing to do that. Thank you. We'll give Council five – we'll give you five minutes – I'm sorry, three minutes for rebuttal. Oh, I'm sorry. I forgot. Good morning, Your Honors. I am Laura Carr from the United Mine Workers, representing the intervener. We intervened in this case in support of the Secretary of Labor, and we concur fully in the Secretary's arguments. I'd also like to highlight a couple of additional points. First is one that Ms. Scott did touch on, and that's that the anonymity guarantee under Section 103G is important statutorily and from a policy perspective because it's central to the success of the Mine Act's regulatory scheme. Miners are better positioned than MSHA inspectors are to recognize hazards in the mine because they are continually present at the work site. MSHA, therefore, relies on miners to assist in enforcement by reporting hazards to the agency. As we've seen throughout the cases and the arguments presented here, that anonymity is a necessary precondition to getting that assistance effectively. Without it, the miner faces an unaccessible double bind of choosing to speak out for safety or choosing to remain silent to preserve a good relationship with management and under certain circumstances to preserve his job itself. The interference with anonymous hazard complaints, then, is a serious matter precisely because it limits miners' ability to provide the necessary assistance to the agency. This is why anonymous reports are so carefully protected in the Act, even as Ms. Scott discussed, when they are non-meritorious, even when they are arguably frivolous. Miners have an absolute statutory right to make these anonymous complaints so that MSHA is apprised, as necessary, of hazards that need to be addressed in the work site. The second point is that Murray substantially limited miners' ability to exercise these protected anonymous hazard reporting rights by establishing a mandatory work rule in the form of what the Secretary's brief term, the Tell Murray To policy. Murray has tried to characterize this policy as just a recommendation or a suggestion for the workforce, but Mr. Murray's own words in the awareness meetings reveal the opposite to be true. He used the word to require some variation of it at least three times, emphasizing that miners are bound to follow the policy. What is your position on whether a mine operator can have a policy that requires employees to report safety concerns that they run across to the operator? Like Ms. Scott, the union can imagine circumstances under which such a policy would be acceptable. It would depend highly on the specific text of the policy, on how the policy was communicated and presented to the workforce. Assume it's not linked to, you know, if you file with MSHA, we want to know, you know, we really want to know what the safety concerns are. What are some of the hallmarks, in your view, of a good policy? Would it have to have anonymous reporting? What are you thinking of that would make such a policy consistent with the miners' rights and what are some of the things that you're thinking of that would make it run afoul of the miners' rights? Yeah, so I'll preface my answer by stating that this would be a highly fact-specific analysis from the union's perspective and so I am speaking only in hypotheticals and it would depend greatly on the actual circumstances of the policy in question. But we would expect it to be completely delinked from 103G reporting. We would expect it to not impinge in any way upon miners' ability to make anonymous reports to the agency. We'd expect it to be presented to miners in a way that is non-coercive, non-threatening, not linked at all to their continued employment or the survival of the company. And it takes – we would hope that it would take a collaborative approach and not be something that is kind of issued as a threat to miners, that you must give us all this information or else. So that means there couldn't be any disciplinary or employment consequences for miners who failed to comply with an operator rule that safety concerns must be brought to the union. I don't know that I'm prepared to make that pronouncement here. I mean, as I stated in the beginning of my answer, it would depend significantly on what the actual text of the policy says, how it's presented, and whether the union had any involvement in bargaining over this and working with our signatory employers to develop this. You're in a real stretch to say there could never be discipline because the rule might be something like if there's obviously a hazardous situation where you're working, you've got to tell us, and it ends up causing a disastrous accident because the miner never said anything, maybe that person could be disciplined. That has nothing to do with the statutory right. It's not interfering with that person's right to report something to the commission. The union's not prepared to take the position that discipline would never be acceptable. It, again, would depend on the facts specific to the policy in question. These policies usually bargain with the union or are they usually done separately? The union would take the position they should be bargained. Obviously, the policy in this case was not bargained with the union. Murray has tried to make the argument that that means that it was not an actual work rule, was not mandatory for the miners to abide by it, but as the arbitration decision cited in the union brief show, the fact that a new rule was not bargained over doesn't mean that it exists out in the ether somewhere and doesn't have any substance. It means that the company acted improperly through improper unilateral procedures in implementing that. Does it matter to the issue before us whether it was a rule or not? I think that it matters inasmuch as the mandatory nature or, from Murray's perspective, the lack thereof has an impact on how a reasonable miner would view these pronouncements in the awareness meetings, whether a reasonable miner would feel that this is something that truly impinges on his ability to make anonymous reports to the company. If management is just suggesting, oh, you know, we think it's a good idea if you do this. That's one thing. If management is saying, you must make the same report to us that you make under 103G and couches it, as Murray did, in a presentation that directly connects 103G reporting to the survival of the company, to miners' continued employment, and is essentially threatening that miners will lose their jobs if they don't make certain changes in the way that they comport themselves, including by following this new policy, I think that a reasonable miner is going to think about that very differently. Ultimately, it's this reasonable miner's perspective that's important here. Even, arguably, if Murray had not created a new mandatory rule via the awareness meetings, anybody who sat through those presentations is going to take away, this is something that management expects me to do and this is something that I'm required to do. And it's that reasonable listening miner's perspective that's relevant here in this analysis. Thank you very much. Thank you, Your Honor. I'm sorry, now Ms. Lopez will give you three minutes. Thank you, Your Honor. First of all, I think it's important to note that before there was any discussion of 103G complaints in the presentation, there is one slide that says that safety, you must report unsafe situations, compliance issues to management so that they can be addressed by management. So the presentation was not focused solely on 103G complaints or safety concerns that were the subject of 103G complaints. This was reiterating what was already a rule that existed in the collective bargaining agreement that all unsafe situations that come to the attention of a miner must be reported to management so they can be addressed quickly. Your Honor, I think it's also important to note that the Secretary's interpretation here would result in a different test being used for interference as opposed to discrimination. We've had a fair amount of discussion on that today. But isn't the whole point to make the interference aspect have some independent function in the statute? It's meant to, the independent function comes from the fact that the word discrimination or discharge that appear wouldn't cover every situation that comes up. So it's basically meant to cover what are chilling statements made by foremen to their miners or things of that nature that don't result in a consequence of employment that would fit under discrimination or discharge. We do not believe, though, that using interference in 105C is meant to set a lower standard for proof of interference that has long been the test for discrimination under the Mine Act and therefore motivation needs to be part of the interference test. I'd also like to point out with regard to Chevron deference that I know there's a lot of questions about any policy guidance by the Mine Safety and Health Administration to help employers to understand what is interference and what is not. I'm not aware of any such guidance on IFAS's website or in any discussions that at least I've been involved in with the agency for my clients. There really is nothing out there to guide operators. In terms of Chevron deference, this is not the type of provision of the Mine Act that requires some kind of special expertise on the Secretary's part. It's not regarding technical aspects of safety and there has been no rulemaking done in this area. I wanted to clarify something before your reply brief on page 5. It sounded to me like you're abandoning the argument that it has to be a retrospective reactive motive. Is that right? That's correct, Your Honor. We changed our reading of the statute in response to the Commission's decision in the Monongalia case. Okay, so it's now your client's position that interference probably at least covers both retrospective and prospective efforts to interfere. That's correct, Your Honor. Looking at what interference means and the promises of benefit and threats of reprisal type of language in legislative history, we've adjusted our reading in conformance with one of the separate opinions in that other case. So, Your Honors, again, there already existed a rule in the collective bargaining agreement requiring miners to report safety issues to management and that's what was being reiterated in these presentations. There were comments made about 103G and concerns that this right of miners was being used against the company, but nevertheless, the concern and the focus was really to make sure that miners don't walk by hazards and leave them sitting there until they can come out of the mine and call MSHA and MSHA can respond. That's a critical delay for safety. We'd like to ask that the petition for review be granted and the Commission's August 2016 and March 2018 decisions be vacated. Thank you. Thank you. Case is submitted.
judges: Millett, Pillard, Edwards